**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------------------x

KHAIRUL ANNAM and NAHEED AFROZ             :
                                           :  Index No.: 22-CV-2945
                                           :
                                           :
                                Plaintiffs, :
          -against-                        :
                                           :
                                           :
CITY OF NEW YORK, NEW YORK CITY DEPARTMENT OF :
BUILDINGS, MELANIE E. LA ROCCA, Commissioner, :
TIMOTHY E. HOGAN, MATTHEW MILLNER, LEONID  :     **SECOND**
MILLER, YEGAL SHAMASH, GEOFFREY B. EISELE,  :     **AMENDED**,
JOSEPH ACKROYD, KEVIN SCHULTZ              :     **COMPLAINT**
MATTHEW DIBONO, LISTORIEL VASQUEZ          :
                                           :
                                Defendants. :
--------------------------------------------------------------------------------x

　　　　Plaintiffs, through their attorney, DAVIS NDANUSA IKHLAS & SALEEM as and for

their complaint against the defendants herein allege:

<u>**PRELIMINARY STATEMENT**</u>

　　　　**1.**　This is a civil rights actions brought by Plaintiffs Naheed Afroz and Khairul Annam

seeking damages and redress for Defendants' violation, *inter alia*, under color of state law or

action, or the rights of the plaintiffs secured by the 14th Amendment of the United States

Constitution and/or the laws and Constitution of the State of New York.　The claims made

herein arrive from discriminatory action of Defendant Mathew Millner and the steps other

government agency workers employed in either covering up or assisting Mr. Millner. The

discriminatory act arises from Millner, and by reference the City of New York and the

Department of Building's, practice of treating White employees differently from non-White

employees and harassing non-White employee out of their employment positions to make

promotional room for White employees.

1

## JURISDICTION AND VENUE

**2.** Plaintiff has fully complied with the administrative prerequisites to the filing of this action under state law by timely serving a filing a notice of Claim in compliance with General Municipal Law § 50.

**3.** This Court has jurisdiction over Plaintiffs' claims brought pursuant to the Equal Protection Clause of the Fourteenth Amendment under 42 U.S.C. § 1983; deprivation of substantive and procedural due process in violation of the Due Process Clause of the Fourteenth Amendment under 42 U.S.C. § 1983; retaliation under 42 U.S.C. § 1983.

**4.** This Court has supplemental jurisdiction over Plaintiffs' common law claims of abuse of process and Article I, § 11 of the New York State Constitution; and race and national origin discrimination in violation of New York City Administrative Code § 8- 107 and New York State Executive Law § 296.

**5.** Venue is proper in the United States District Court for the Southern District of New York sitting in New York County, New York because incidents giving rise to this lawsuit occurred in New York County and the Defendant City of New York is a resident of New York County.

**6.** The discriminatory and retaliatory actions taken against Plaintiff by the individual Defendants in this case in violation of his federal civil and constitutional rights were carried out under color of state law and the Defendants are therefore liable to Plaintiff under 42 U.S.C., section 1983.

**7.** Prior to the commencement of this action, and within ninety (90) days after the happening of this accident, plaintiffs served a Notice of Claim, in writing upon defendants CITY and DOB containing all of the data required by statutes and cases.

**8.** Defendants CITY and DOB acknowledged receipt of the Notice of Claim herein.

**9.** No hearing notice was received by the Plaintiffs herein or their attorneys.

## PARTIES

**10.** Plaintiff KHAIRUL ANNAM (hereinafter "ANNAM") was an employee of the Department of Buildings and at all times mentioned herein is a resident of the Borough of Queens.

**11.** Plaintiff NAHEED AFROZ (hereinafter "AFROZ") is at all times mentioned herein is a resident of the Borough of Queens. She is the spouse of Annam.

**12.** At all times hereinafter mentioned, defendant CITY OF NEW YORK (hereinafter "CITY"), was and still is a municipal corporation existing under and by virtue of the laws of the State of New York.

**13.** At all times hereinafter mentioned, defendant NEW YORK CITY DEPARTMENT OF BUILDINGS (hereinafter "DOB"), was and still is a public authority duly organized and existing under and by virtue of the laws of the State of New York.

**14.** At all times hereinafter mentioned, defendant, CITY, employed persons as contractors and said persons were so employed as contractors by and through the DOB.

**15.** That Defendant MELANIE E. LA ROCCA (hereinafter "Rocca") is a natural person whom, upon information and belief, is residing in the State of New York.

**16.** That Defendant TIMOTHY E. HOGAN (hereinafter "Hogan") is a natural person whom, upon information and belief, is residing in the State of New York.

**17.** That Defendant MATTHEW MILLNER (hereinafter "Millner") is a natural person whom, upon information and belief, is residing in the State of New York.

**18.** That Defendant LEONID MILLER (hereinafter "Miller") is a natural person whom, upon information and belief, is residing in the State of New York.

**19.** That Defendant YEGAL SHAMASH (hereinafter "Shamash") is a natural person whom, upon information and belief, is residing in the State of New York.

**20.** That Defendant GEOFFREY B. EISELE (hereinafter "Eisele") is a natural person whom, upon information and belief, is residing in the State of New York.

**21.** That Defendant JOSEPH ACKROYD (hereinafter "Ackroyd") is a natural person whom, upon information and belief, is residing in the State of New York.

**22.** That Defendant KEVIN SCHULTZ (hereinafter "Schultz") is a natural person whom, upon information and belief, is residing in the State of New York.

**23.** That Defendant MATTHEW DIBONO (hereinafter "DiBono") is a natural person whom, upon information and belief, is residing in the State of New York.

**24.** That Defendant LISTORIEL VASQUEZ (hereinafter "Vasquez") is a natural person whom, upon information and belief, is residing in the State of New York.

## FACTS

### Fabricated Reports

**25.** As of March 2017, Annam was working with the DOB's Construction Safety Enforcement Unit (hereinafter "CSE") as an administrative engineer for about four (4) years, at that time.

**26.** On or about March 15, 2017, the director of Annam's CSE unit, Defendant Millner, directed Annam to write a violation to an African American registered architect. However, when Annam inquired about the merits of this violation, Millner's explanation was unsatisfactory because it did not correspond with DOB's guidelines and standards regarding

the issuance of violations. In other words, Annam did not believe the architect committed a violation, yet Millner insisted that Annam issue said violation regardless. As per Annam's job duties, it was not his duty to write or issue violations to any license architect or engineer.

**27.** Per DOB guidelines, Millner, as the director of the CSE, was required to discuss potential violations with Ismail, Ghouse (hereinafter, "Ghouse"). Ghouse, as the assistant chief engineer of the CSE, was then required to discuss potential violations with Annam. However, Millner violated DOB's guidelines and directly communicated this potential violation with Annam.

**28.** Driven by his rules of ethics and his own religious conviction, as a result, Annam told Millner that he would not proceed with the drafting of the violation, and in response to Annam's refusal, Millner threatened to report Annam to DOB's Office of Internal Affairs and Discipline (hereinafter "IAD").

**29.** Annam then told Millner that he would report their conversation, regarding the attempt of a forced, meritless violation issuance, and the proceeding threat, to IAD as well. It was later determined that neither party would report the other to the IAD. As discussed further below, Millner, and a host of other actors, took other measures to retaliate against Annam.

**30.** As part of those many measures, on or about January 16, 2018, Annam was unexpectedly called into an internal meeting with Defendants Eisele (CSE's executive engineer) and Miller (CSE's assistant commissioner). During this meeting, Eisele and Miller inquired about Annam's work and concerns. Annam stated that, as much as he enjoyed his profession, Annam felt micromanaged by Millner.

**31.** On or about April 24, 2018, Annam received a Probation Evaluation Form associated with his job title. However, this evaluation was inconsistent with his prior

evaluations, and it was an uncharacteristically poor evaluation of Annam. When Annam addressed these concerns with his immediate supervisor at that time, Ghouse, he stated that he did not prepare the evaluation.

**32.** Rather, upon information and belief, Millner instructed Ghouse to provide Annam with a poor evaluation. Ghouse refused to draft such an evaluation and told Millner that Annam was a great worker. Millner then threatened to report Ghouse to IAD, but Ghouse still refused to write an inaccurate and false evaluation. However, Millner proceeded to write the evaluation himself and Ghouse would then sign the evaluation form at Millner's insistence.

**33.** Millner then took the evaluation and requested Annam to sign it. Annam refused to sign the fabricated evaluation and even wrote on the evaluation report itself that the contents therein were not accurate, and that said evaluation report was a product of an "inappropriate use of authority."

**34.** Upon information and belief, this was the first of many steps to discriminate against Annam based on his religion, national origin and ethnicity.

**Harassment at the Primary Residence**

**35.** On or about July 31, 2018, per DOB's protocol, Annam informed IAD about construction work at Annam's primary residence located at 20-40 28th Street, Astoria, NY 11105 (hereinafter, the "Primary Residence"). DefeDiBono from IAD acknowledged receipt of Annam's notification and stated that Annam should make efforts to recuse himself and his own unit from the process and review of paperwork regarding the Primary Residence's construction work.

**36.** In yet another bad act, on or about August 2, 2018, Millner reported Annam to IAD. The agenda for Annam's meeting with IAD included items such as projects from March 15,

2017, through April 13, 2018. Additionally, the agenda included allegations that Annam reviewed technical drawings and audits of the Primary Residence. This was patently false because Annam retained an engineering firm, KNF Services Corp. (hereinafter, "KNF"), to prepare the technical drawings and file said drawings with the DOB. Furthermore, as previously mentioned, Annam informed IAD of the construction work being conducted at the Primary Residence and recused himself from all work regarding the Primary Residence.

37. During Annam's meeting with IAD, on or about August 2, 2018, Annam informed IAD about the meeting that occurred between Annam and Millner on or about March 15, 2018. Annam further informed IAD that Millner attempted to force Annam to write a violation to an African American architect on meritless and baseless grounds. Annam continued to inform IAD that Millner then forced Ghouse to sign a false evaluation report regarding Annam, and Annam refused to accept and sign the false evaluation report. Annam also notified IAD that he reported the construction work at the Primary Residence to IAD, and that IAD confirmed receipt of said notification. Following this meeting between IAD and Annam, there was no adverse action taken against Annam.

38. On or about November 21, 2018, DOB's CSE unit sent three inspectors to the Primary Residence. This was against DOB policy and in direct violation of IAD's instructions from July 31, 2018, as the three inspectors, non-party Steven M. Lore (herein, "Lore") and his team members were from Annam's unit and under Eisele's supervision.

39. On or about November 21, 2018, Annam informed to IAD via email that non-party Lore and his team were conducting said inspection at Annam's Primary Residence.

**40.** In fact, on or about November 21, 2018, Annam overheard Defendant Eisele – the Executive Engineer of Annam's CSE Unit – instructing the three inspectors to visit Annam's Primary residence.

**41.** On or about November 27, 2018, non-parties Lore, Gonzales, and their team members went to inspect the Primary Residence and issued a stop work order, as per Millner's instructions, effectively placing a halt on the construction at the Primary Residence as it was to be audited by Annam's own unit. Not only was it against DOB's policy to have Annam's own unit audit Annam's Primary Residence, but it was also against CSE's policy to a place stop work order on the Primary Residence because the construction work was over ninety (90%) percent complete. Per CSE's policy, violations may be issued but stop work orders cannot be issued on construction sites where over ninety (90%) percent of the work is complete.

**42.** On or about November 27, 2018, Annam informed to IAD via email that non-parties Lore, Gonzales, and their team members inspected the Primary Residence, under Brower's supervision. On or about November 28, 2018, Defendant DiBono from IAD responded via email and directed Annam not to call or email IAD regarding the Primary Residence. This directive from DiBono violated DOB's policy and contradicted Defendant Dibono's previous email to Annam on or about July 31, 2018.

**43.** On or about December 4, 2018, Plaintiff Afroz, Annam's spouse, went to CSE's office to inquire with non-parties Gonzales and Lore regarding the stop work order and audit. Non-parties Gonzales and Lore stated that the Primary Residence was under audit because the contractor installed 8-inch metal joists when it was supposed to be allegedly 12-inches. However, the approved drawings for the Primary Residence reflected 8-inch joists.

**44.** On or about December 6, 2018, non-party Lore went to the Primary Residence again and issued another violation, dated November 27, 2018. This was again against CSE's policy because, per the policy, if the inspector cannot complete the issuance of all violations on the day that they were at the job site, they are required to complete the issuance of all violations on the next business day.

**45.** On or about December 7, 2018, non-party Norman Ho (herein, "Norman") informed Plaintiff Afroz that he would be conducting the audit at the Primary Residence and requested documents from Afroz's and Annam's retained engineers.

**46.** Plaintiff Afroz requested non-party Norman to visit the Primary Residence so that non-party Norman could see that the construction job was over ninety (90%) percent complete and so non-party Norman could coordinate with the Plaintiffs' engineers. Plaintiff Afroz then informed non-party Norman that the construction work was intended to accommodate the Plaintiffs' two children. She offered to work with him and to provide everything that he may have needed to help with his review. Non-party Norman disregarded all of her requests and instead waited for the documents from the Plaintiffs' engineers.

**47.** On or about December 12, 2018, the Plaintiffs' engineer submitted a signed and sealed request to non-party Norman for a partial lift for identified items, so that the Plaintiffs' can complete urgent construction work. This request was never authorized.

**48.** On or about January 3, 2019, non-party Norman issued twenty-six (26) objections associated with the design and drawings. His audit team included Defendants Eisele and Shamash. As previously mentioned, Eisele was not only CSE's executive engineer, but he was also Annam's executive engineer, which constituted a continuing conflict of interest and violation of DOB's policy as Eisele and his unit were required to recuse themselves.  Millner,

Shamash and Eisele are all former employees of the firm Robert Silman Associates and acted with one mind against claimants despite the requirement that they act objectively.

**49.** Nonetheless, non-party Norman's audit report stated that the objections were for structural-related issues only, however, some of the objections included several items unrelated to structural issues.

**50.** Furthermore, the initial stop work order was based on the size of the metal joists, however, non-party Norman's objections did not include this alleged issue.

**51.** On or about January 18, 2019, Plaintiff Afroz submitted an official complaint via email to Defendant Schultz at IAD. Plaintiff Afroz researched DOB's policy on open data/permits and concluded that DOB was discriminating, retaliating and harassing Afroz as a homeowner. Plaintiff Afroz provided the basis of her conclusion to Defendant Schultz. In response, and on or about January 31, 2019, Defendant Schultz only provided Plaintiff Afroz with CSE's customer service contact information.

**52.** In one of the more critical acts of retaliation, on or about January 21, 2019, Defendants Millner, Miller, and Eisele held a meeting with Annam, where they informed Annam that he would be transferred from the CSE to the Construction Safety Compliance Unit (hereinafter "CSC"). It was stated that the DOB's Deputy Commission, Defendant Hogan, requested this transfer.

**53.** CSC is a less prestigious role than CSE. Annam fully qualified at the time of his hiring for a job with CSE.

**54.** Annam was forced to leave CSE for the CSC position, just three days after Ghouse retired from his position as assistant chief engineer of the CSE.

**55.** Ghouse was an Indian Muslim American.

**56.** At the time of Ghouse retirement, there were three license engineers at CSE.

**57.** Annam was the most senior of the remaining CSE engineers.

**58.** After Annam was moved to the less prestigious CSC position, Austin Allcot, assumed the position of assistant chief engineer of the CSE, a position that would have gone to Annam if he had not been forced to leave CSE. Allcott is White.

**59.** Allcot was the third most senior engineer at CSE after Ghouse retired.

**60.** The second most senior licensed engineer after Annam was Imran Akond.

**61.** Akond, like Annam, was a Muslim American Bangladeshi. Millner forced Akond out of CSE.

**62.** Bert Thomas, an unlicensed black engineer, was also forced out of CSE by Millner even before Annam and Akind suffered the same fate.[1]

**63.** On or about January 24, 2019, the Plaintiffs' engineer submitted responses to non-party Norman's objections.

**64.** On or about February 27, 2019, non-party Norman provided further objections to the construction at the Primary Residence. Said objections were repetitive from the previous objections and contained a few additional objections.

**65.** On or about March of 2019, and in response to non-party Norman's second set of objections, KNF held a meeting with the CEU to discuss the audit objections. During the meeting, Defendant Shamash was behaving in a very unprofessional manner and was demeaning and demoralizing KNF. Following this meeting, KNF resigned from their engineering duties at the Primary Residence. KNF stated that their resignation was due to Defendant Shamash's behavior and KNF believed that the audit "will never finish."

---

[1] Upon information and belief, the following other Muslim minorities also faced other types of discrimination, by DOB: Faisal Ahmed, Naweed Chaudhri and Khalid Eid

**66.** Since KNF's resignation, Annam reached out to many engineering firms. Upon information and belief, Wexler Associates, contacted the DOB before agreeing to complete renovations at the Primary Residence. Wexler Associates' representatives stated that they cannot complete said renovations because they regularly conduct business with the DOB. Upon information and belief, Defendant's Shamash's department instructed Wexler Associates to decline Annam's job offer.

**67.** Ultimately Mr. Annam acted as his own engineer for his residential project.

**68.** By acting as his own engineer this increased the time Mr. Annam, and indeed his family, had to expend in completing the project.

**69.** The man hour labor resources spent on the project should compensated.

**70.** Between about January 2019 and about January 2020, Annam's cubicle was moved at least 11 times at the CSC. Although Annam was no longer with the CSE and was working with the CSC, Annam's timesheets and leave requests were still being approved by Millner, who was the director of the CSE.

**Harassment at the Secondary Residence**

**71.** On or about March 10, 2019, Plaintiff Afroz sent an email to non-party Norman and Shamash, stating that non-party Norman's twenty-six (26) objections were meritless because they did not include structural related issues – when the initial stop work order was based on structural issues. non-party Norman's twenty-six (26) objections were zoning issues, when said alleged zoning issues were already approved by DOB's Queens Borough Office prior to the start of renovations at the Primary Residence.

**72.** Without responding to Plaintiff Afroz's concerns, and on or about March 12, 2019, at or about 8:43 A.M., Plaintiff Annam received a phone call from his tenant, who resided at

24-45 32nd Street, Astoria, NY 11102 (hereinafter, the "Secondary Residence"). Annam's tenant stated that a DOB inspector was present at the Secondary Residence and the inspector, Defendant Vasquez, wanted to speak with Annam. Defendant Vasquez told Annam that he was there to inspect the boiler of the Secondary Residence. Annam told Defendant Vasquez to return the next morning for the inspection.

**73.** Afterwards, Plaintiff Afroz called DOB's Queens Borough Office and was informed that the DOB does not inspect boilers for 1-unit to 3-unit family homes – when the Secondary Residence was a 1-unit to 3-unit family home. Also, on or about March 12, 2019, Plaintiff Annam went to DOB's head office and spoke with the director of the boiler unit, who confirmed that the DOB does not inspect boilers for 1-unit to 3-unit family homes. DOB's director of the boiler unit also informed Annam that, if necessary, he should contact the local police department to have the inspector arrested because the inspection would have been considered unlawful.

**74.** On or about March 13, 2019, Defendants Vazquez and his assistant came to the Secondary Residence and spoke with Plaintiff Afroz. She told them that since Annam was working for the DOB, Annam intended on informing the Department of Investigation, (hereinafter, "DOI") and IAD regarding Vazquez's attempted inspection. Afroz further informed Defendant Vazquez that when the DOI and IAD conduct their inspection on the Secondary Residence that Vazquez is welcomed at that time to also join the inspection.

**75.** Defendant Vazquez refused Plaintiff Afroz's request to inspect the Secondary Residence at a later time, and instead, forced his way into the Secondary residence. Said inspection resulted in three false violations.

**76.** The false violations deemed the basement to be considered a cellar, when in fact, the basement at the Secondary Residence is indeed a legal basement. Per DOB's code, the ground level is considered a basement when the level is more than fifty (50%) percent above ground, however, the Secondary Residence's ground level is eighty (80%) percent above ground.

**77.** Also on or about March 13, 2019, Defendant Vasquez issued a vacate order. The false vacate order stated that the basement was a cellar, when in fact it was a basement as described above. It further stated that were no windows and no means of egress, when in fact there were at least five (5) windows and three (3) means of egress.

**78.** The result of this false vacate order caused the Plaintiffs to lose their tenant at the basement of the Secondary Residence on or about March 13, 2019 and Plaintiffs have been unable to rent the basement since. The false vacate order also caused the first-floor tenants of Secondary Residence to stop paying rent and they would also eventually leave the Secondary Residence in or about May 2019 out of fear that the first floor may also be issued a false vacate order.

**Employment Interference**

**79.** On or about May 2019, Annam intended to begin employment with the New York City's Department of Design and Construction (hereinafter, "DDC"), scheduled for on or about June 3, 2019.

**80.** On or about May 29, 2019, Defendant Shamash asked Annam if Ashwani Bedi would be Annam's boss or supervisor at the DDC, to which Annam responded in the affirmative. On or about May 30, 2019, Annam was told that the DDC was delaying the joining date and thereafter, rescinded their job offer because there was an alleged internal investigation

against Annam within the DOB. Thereafter, Annam emailed DOB's human resources (hereinafter, "HR") and Annam informed HR about the alleged internal investigation against himself. HR informed Annam that an investigation against him did not exist within the DOB. Upon information and belief, someone outside of HR interfered with Annam's job offer. Upon information and belief, Defendant Shamash spoke with Ashwani Bedi and made false accusations against Annam in order to prevent Annam from obtaining employment within the DDC.

**Harassment at the Primary Residence (Continued)**

**81.** On or about June 6, 2019, Annam being unable to find new employment or find a new engineering firm to complete renovations at the Primary Residence, he decided to complete said renovations himself. As a result, Annam was required to submit his work to Defendant Ackroyd, the assistant commissioner of DOB's Technical Affairs (hereinafter, "TA"). Per DOB's Executive Order #2/01, since Annam was a DOB employee, only the TA's deputy commissioner can review and/or approve Annam's work. However, at all relevant times herein, non-party Hao Sun assisted Defendant Ackroyd, if not reviewed Annam's work on Ackroyd's behalf.

**82.** Upon information and belief, on or about June 2019, Defendants Hogan, Shamash, Eisele, and Millner had a meeting with Defendant Ackroyd regarding Annam's renovations at the Primary Residence.

**83.** On or about July 29, 2019, Defendant Ackroyd had a meeting with Annam, where Ackroyd stated that he didn't agree with the DOB's Queens Borough Office's initial approval of the renovations at the Primary Residence. Ackroyd stated that he was holding Annam to a different standard. Furthermore, Ackroyd instructed and demanded that Annam was required

to renovate his entire home, rather than the initially planned extension on the Primary Residence. Annam reluctantly agreed because he believed he had no choice but to agree to Ackroyd's demands. Annam eventually renovated his entire home pursuant to Ackroyd's demands, which resulted with Annam spending at least three (3) times the original anticipated costs. Even after completing the renovations pursuant to Defendant Ackroyd's demands, Ackroyd would not release the audit hold on the Primary Residence. Defendant Ackroyd stated that since the audit was being conducted by Defendant Shamash's department, only Shamash could release the audit hold.

84. On or about October 9, 2019, Defendant Rocca, DOB's commissioner, was speaking with CSC team members when Annam approached Rocca. Annam briefly explained to Rocca the above referenced situation regarding the audit hold on the Primary Residence and the harassment of his family. Following this brief encounter, Annam followed up with Rocca by sending her an email describing the audit hold situation in more detail. On or about October 21, 2019, Defendant Rocca, DOB's commissioner, had a meeting with Annam, during meeting Annam explain everything to Rocca and submitted all required drawings and documents, and requested lift of the stop work order. Rocca did not lift the stop work order, but rather stated that she would speak with Ackroyd and let Annam know the results of that communication. About two weeks thereafter, on or about November 6, 2019, Annam followed up with a second email because Rocca did follow up with Annam following their meeting.

85. On or about October 15, 2019, Naheed Afroz submitted a refund application to DOB because the violation was dismissed at ECB court. DOB never refund Afroz and Annam.

86. On or about January 13, 2020, and after months of checking in with Ackroyd regarding the approval of Annam's work, Ackroyd finally approved the permits for Annam's

renovations at the Primary Residence. Annam sent an email to the CSE unit and Ackroyd to lift the stop work order. On or about January 24, 2020, Ackroyd emailed Annam that the CSE unit's Defendants Miller, Eisele, and non-parties Brower, Lore, and Gonzales were not granting Ackroyd's approval. Ackroyd informed Annam that Annam need to revise the drawings and documents as per CSE's demand. Although Ackroyd is above defendants Miller, Eisele, and non-parties Brower, Lore, and Gonzales. They cannot question about Ackroyd's authority and approval.

**87.** In or about February of 2020, Annam and his union representative had a meeting with Defendant Schultz, where Schultz would provide new rules and regulations regarding the renovations at Annam's Primary and Secondary Residence. When Annam's union representative inquired with Defendant Schultz about these new rules and regulations, Schultz stated that these new rules were only applicable to Annam and his property and nobody else.

**88.** Over a month after Ackroyd's approval, and on or about March 5, 2020, Ackroyd send an email to the CSE's team approving the removal of the stop work order at the Primary Residence.

**89.** During the entire time when the stop work order was in effect, Plaintiffs were unable to rent any portion of the residence to prospective tenants or use for his family.

**Department of Investigation**

**90.** On or about December 10, 2018, Plaintiff Afroz emailed non-parties Gregory Cho and Connor Prendergast (herein, "Prendergast"), with the DOI, regarding the issues about the Primary Residence. However, non-parties DOI, Cho, and Prendergast failed to investigate.

**91.** On or about June 19, 2019, Plaintiff Annam emailed non-party Margaret Garnett (herein, "Garnett"), the commissioner of the DOI, as per NYC Rules and informed the

circumstances regarding the Primary Residence, Secondary Residence, and false evaluation report. As per Garnett's secretary, Garnett didn't receive Annam phone call and failed to investigate said circumstances.

**92.** On or about July 2, 2019, Plaintiff Annam had a meeting with non-party Janaina Siguencia (herein, "Siguencia") and Ross Hoffman (herein, "Hoffman"), with the DOI, regarding the issues about the Primary Residence, Secondary Residence, and false evaluation report. However, non-parties Siguencia and Ross Hoffman failed to investigate said issues.

**93.** The facts alleged above has had an emotional impact on Annam and his family. For over three years, Mr. Annam was under the constant and illegal pressures of Millner and his cohorts. The pressure consisted of all the acts of retaliation described above, which include but were not limited to harassment at the different properties, false IAD complaints, the moving of his cubicles 11 times in the span of a year and the unnecessary pressure to repair his house when no such repair or construction was necessary.

**94.** Mr. Annam took out life insurance during this time because he feared being injured by Millner and his cohorts.

**95.** The premium for the insurance is excessive and this action was taken only because Annam feared for his safety and his life.

**AS FOR A FIRST CAUSE OF ACTION:**
**ABUSE OF PROCESS**
(Against All Defendants)

**96.** Plaintiffs repeat and allege each and every allegation contained in the above paragraphs as though fully set forth herein.

**97.** By virtue of the foregoing, Defendants are liable to the Plaintiff for Abuse of Process.

**98.** These deficiencies as detailed herein were knowingly, wanton and willful acts of Abuse of Process and Conspiracy to Abuse Process by the Defendants for, *inter alia*, (1) drafting a false and inaccurate evaluation report about Annam, (2) for continuously failing to recuse themselves from the audit process at the Primary Residence, (3) for violating, obstructing, and harassing Plaintiffs and their right to construct and/or renovate their own home at the Primary Residence, (4) for baseless and meritless inspections at the Secondary Residence that served no purpose but to harass the Plaintiffs, (5) for harassing Annam by effectively forcing him to switch units at the DOB when he was in the best position for a promotion within his previous CSE unit, (6) for continuing to harass Annam at the CSC by making him switch cubicles 11 times in one year without adequate and/or reasonable justification, and (7) for making it difficult for Annam to obtain new employment without harassment from Defendants.

**99.** Plaintiffs allege that Defendants CITY, DOB, Millner, Miller, and Eisele for their own collateral reasons, drafted and otherwise aided with the fabricated evaluation report regarding Annam despite Annam's history of overwhelming positive evaluation reports, and the fact that Ghouse (Annam's direct supervisor whose duty is it to draft evaluation reports about Annam) refused to draft the subject fabricated report about Annam.

**100.** Plaintiffs further allege that all Defendants, for their own collateral reasons, failed to recuse themselves from the audit process at the Primary Residence and commenced and otherwise continued to violate, obstruct, and harass Plaintiffs and their right to construct and/or renovate their own home at the Primary Residence, despite the fact that the DOB's Queens Borough Office approved the renovation plans beforehand and the Defendants inconsistent and contradictory reasons for commencing and continuing the audit process at the Primary Residence. Furthermore, all members of the CSE unit, and especially those in

supervisory positions, were required to recuse themselves during the audit process of the Primary Residence, but continuously and intentionally failed to do so.

101.    Plaintiffs further allege that Defendants CITY, DOB, Vasquez for his own collateral reasons, commenced and otherwise continued the wrongful inspection of the Secondary Residence's boilers, even though the Secondary Residence is a 1-unit to 3-unit family home, and it goes against the DOB's policy to inspect boilers for 1-unit to 3-unit family homes.

102.    Plaintiffs further allege that Defendants CITY, DOB, Shamash, Millner, Miller, Eisele, and Hogan, for their own collateral reasons, transferred Plaintiff Annam to the CSC, when it is undisputed that Annam was due for a promotion within the CSE. Furthermore, Defendants CITY, DOB, Shamash, Millner, Miller, Eisele, and Hogan, for their own collateral reasons, also made it difficult for Annam to find employment elsewhere by falsely informing other potential employers that there was an DOB internal investigation, when DOB's human resources informed Annam that no such investigation was being conducted.

103.    The Defendants' fabricated evaluation report against Annam occurred in order to obtain a collateral objective, which was to harass the Plaintiffs and their children. The Defendants further utilized the DOB audit process for home renovations for the Primary and Secondary Residence in order to obtain a collateral objective, which to harass the Plaintiffs and their family.

104.    Defendants own collateral object also included the abuse of their position of power and/or authority to harass Annam at work and to make it difficult for Annam to obtain work elsewhere.

**105.** As a direct result of Defendants' abuse of process, Plaintiffs suffered economic loss, emotional distress, humiliation, and mental anguish.

**106.** By reason of the foregoing, Plaintiffs are entitled to a money judgment for compensatory damages against all Defendants, with interest at the legal rate accrued and accruing thereon.

**107.** Given the despicable, willful, wanton, and malicious nature of Defendants' conduct, Plaintiffs demand punitive and special damages on this claim.

<u>**AS FOR A SECOND CAUSE OF ACTION:**</u>
<u>**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**</u>
(Against All Defendants)

**108.** Plaintiffs repeat and allege each and every allegation contained in the above paragraphs as though fully set forth herein.

**109.** Defendants, and each of them, engaged in outrageous conduct towards Plaintiffs, with fictitious accusations and malicious attempts to harass and disrupt Plaintiffs from, among other things, renovating the Primary Residence. Defendants continued this practice with the intention to cause, or with reckless disregard for the probability of causing, Plaintiff to suffer severe emotional distress. To the extent that said outrageous conduct is being perpetrated by certain Defendants, the remaining Defendants adopted and ratified said conduct with a wanton and reckless disregard of the deleterious consequences to Plaintiffs. As a proximate result of said conduct, Plaintiffs has suffered and continues to suffer extreme mental distress, anguish, and emotional injuries as well as economic losses.

**110.** By reason of the foregoing, Plaintiffs are entitled to a money judgment for compensatory damages against all Defendants, with interest at the legal rate accrued and accruing thereon.

**111.** Given the despicable, willful, wanton, and malicious nature of Defendants' conduct, Plaintiffs demand punitive and special damages on this claim.

**AS FOR A THIRD CAUSE OF ACTION:**
**NEGLIGENCE IN HIRING, TRAINING, AND SUPERVISION**
(Against Defendants CITY, DOB, and La Rocca)

**112.** Plaintiffs repeat and allege each and every allegation contained in the above paragraphs as though fully set forth herein.

**113.** Defendants and/or each of them had a duty to conduct appropriate and proper hiring and training practices to prevent the hiring and training of those who may pose a risk of harm.

**114.** Defendants and/or each of them had a duty to adequately and properly supervise those whom they did hire in a reasonably prudent fashion, to prevent those they hired and trained from becoming a risk of harm.

**115.** Defendants and/or each of them had a duty to prevent known risks of harm, and to prevent their agents, employees, or supervisees from inflicting harm.

**116.** Defendants and/or each of them had a duty to adequately supervise their agents, employees, or supervisees so as to ensure that they carried out their duties in a manner which reduced and/or eliminated the risk of harm.

**117.** Defendants were negligent, careless and reckless in the manner in which they conducted their hiring, training, and supervising of agents, employees, or supervisees, including but not limited to:

      i. drafting a false and inaccurate evaluation report about Annam;

      ii. continuously failing to recuse themselves from the audit process at the Primary Residence;

    iii.   violating, obstructing, and harassing Plaintiffs and their right to construct and/or renovate their own home at the Primary Residence;

    iv.   baseless and meritless inspections at the Secondary Residence that served no purpose but to harass the Plaintiffs;

    v.   harassing Annam by effectively forcing him to switch units at the DOB when he was in the best position for a promotion within his previous CSE unit;

    vi.   continuing to harass Annam at the CSC by making him switch cubicles 11 times in one year without adequate and/or reasonable justification; and

    vii.   making it difficult for Annam to obtain new employment without harassment from Defendants.

**118.**    Defendants breached their duty to conduct their hiring, training, and supervising practices in a reasonably prudent fashion, and to adequately and properly supervise their agents, employees, or supervisees.

**119.**    That as a result of this negligent hiring, retention and supervision by defendants, and/or each of them, and/or their agents, employees, or supervisees as aforesaid, Plaintiffs are entitled to a money judgment for compensatory damages against Defendants CITY, DOB, and La Rocca, with interest at the legal rate accrued and accruing thereon.

**120.**    Given the despicable, willful, wanton, and malicious nature of Defendants' conduct, Plaintiffs demand punitive and special damages on this claim.

## AS FOR A FOURTH CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
(Against Defendants CITY, DOB, La Rocca, and Shamash)

**121.**     Plaintiffs repeat and allege each and every allegation contained in the above paragraphs as though fully set forth herein.

**122.**     At all relevant times, Plaintiff Annam had a prospective business relationship with DDC as more fully set forth above.

**123.**     Defendants were aware of Plaintiff's prospective business relationship with DDC.

**124.**     Defendants knowingly, intentionally, wrongfully, and tortiously interfered with Plaintiff's prospective business relationships with DDC by instructing and/or influencing DDC to decline Plaintiff's job offer.

**125.**     Defendants utilized dishonest, unfair, and improper means, with the sole purpose of harming Plaintiff, to tortiously interfere with Plaintiff's prospective business relationships.

**126.**     As a direct result of Defendants' wrongful acts, Plaintiff has suffered injury to his business relations with DDC.

**127.**     By reason of the foregoing, Plaintiffs are entitled to a money judgment for compensatory damages against all Defendants, with interest at the legal rate accrued and accruing thereon.

**128.**     Given the despicable, willful, wanton, and malicious nature of Defendants' conduct, Plaintiffs demand punitive and special damages on this claim.

<u>**AS FOR A FIFTH CAUSE OF ACTION:**</u>
<u>**VIOLATION OF THE FOURTEENTH AMENDMENT:**</u>
<u>**EQUAL PROTECTION UNDER 42 USC §1983**</u>
(Against All Defendants)

**129.**     Plaintiff repeats and alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

130.     The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person the equal protection of the laws." U.S. Const. amend. XIV, § 1.

131.     Through the events recited herein, the Defendants, while acting under the color of law, subjected the Plaintiffs to the deprivation of rights, privileges and immunities secured by the Constitution and laws of the United States, and specifically the Equal Protection and Due Process guarantees of the 14th amendment.

132.     Defendants engaged in racial discrimination when they demanded Plaintiff Annam to draft and write a falsified report about a registered architect because the architect was African American. Annam refused to draft such a report based on the Defendants' discriminatory purposes and opposed to engaged in racial discrimination with the Defendants.

133.     Additionally, Defendants regularly discriminate against African American and other DOB employees of color based solely on their ethnic background and because they are not Caucasian or white. Defendants additionally favor and promote Caucasian or white DOB employees for no legitimate reason or basis other than their ethnic background.

134.     Specifically, Annam would have likely been due to a promotion at CSE but for the fact the that he was forced out of CSE.

135.     Annam was forced out of CSE in order to prepare the promotion for a Caucasian employee.

136.     Defendants discriminated against Annam by forcing him to switch to a less prestigious role with the CSC, rather than promoting him to the assistant chief engineer of

the CSE. Plaintiff Annam was overqualified, and the most qualified candidate, to fulfill the position of assistant chief engineer of the CSE.

137.    Once transferred to the CSC, Defendants moved Annam's cubicle 11 times within one year for no legitimate reason other than to harass Annam.

138.    Furthermore, Defendants have stated that they are holding Plaintiff Annam to a "different standard" in regards to the audits at the Primary Residence.

139.    Defendants have also created new rules and regulations in regards to the renovations at the Primary Residence that were only applicable to Plaintiff Annam and nobody else.

140.    Plaintiffs have been deprived of his Constitutional Rights to be free of discrimination based upon their race, national origin, and opposition to discrimination and have been damaged and suffered emotional distress therefrom.

141.    By reason of the foregoing, Plaintiffs are entitled to a money judgment for compensatory damages against all Defendants, with interest at the legal rate accrued and accruing thereon.

142.    Given the despicable, willful, wanton, and malicious nature of Defendants' conduct, Plaintiffs demand punitive and special damages on this claim.

### AS FOR A SIXTH CAUSE OF ACTION: DEPRIVATION OF PROCEDURAL AND SUBSTANTIVE DUE PROCESS UNDER FOURTEENTH AMENDMENT AND 42 USC § 1983
(Against All Defendants)

143.    Plaintiff repeats and alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

144.     The Defendants' conduct herein was an abuse of executive power so clearly unjustified by any legitimate objective of their employment as to be barred by the Fourteenth Amendment.

145.     In addition to the discriminatory practices committed against the Plaintiffs, Defendants have retaliated against Plaintiff Annam's refusal to engage in discrimination by interfering with Plaintiffs' property interests in their Primary and Secondary Residence.

146.     As mentioned above at length, Defendants issued baseless stop work orders and baseless audits for the Primary Residence without proper justification. Defendants violated DOB's own codes in the process of pursuing the baseless audits. This caused the Plaintiffs to have their home renovations unnecessarily prolonged for years and caused inadequate living space for the Plaintiffs and their children.

147.     The stop work order and the baseless audit, like other wrong act complained of here, were stemmed from Millner's discriminatory practices.

148.     Also as mentioned at length above, Defendants issued baseless violations and a vacate order at the Secondary Residence without proper justification. Defendants violated the DOB's own code by forcing themselves into the Secondary Residence, against the will of the Plaintiffs. This caused the Plaintiffs to withhold the sale of the Secondary Residence, as they were unable to sell the Secondary Residence due to the false violations.

149.     The baseless violations at the Secondary Residence also caused Plaintiffs to lose tenants at two different units at the Secondary Residence, and Plaintiffs have been unable to rent both units since in or around March 2019.

150.     As a result of the foregoing, Plaintiffs were deprived of their liberty and right to procedural and substantive due process, causing monetary and emotional injuries.

**151.** By reason of the foregoing, Plaintiffs are entitled to a money judgment for compensatory damages against all Defendants, with interest at the legal rate accrued and accruing thereon.

**152.** Given the despicable, willful, wanton, and malicious nature of Defendants' conduct, Plaintiffs demand punitive and special damages on this claim.

<u>**AS FOR A SEVENTH CAUSE OF ACTION:**</u>
<u>**VIOLATION OF THE CIVIL RIGHTS ACT OF 1871:**</u>
<u>**RETALIATION UNDER 42 USC §1983**</u>
(Against All Defendants)

**153.** Plaintiff repeats and alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

**154.** At all times relevant hereto, Plaintiffs were Bangladeshi Muslims.

**155.** Plaintiffs have been deprived of his Constitutional Rights to be free of retaliation based upon their race, national origin, and opposition to discrimination.

**156.** That at all times relevant herein, the individual Defendants were acting under the color of state law.

**157.** The Defendants purposefully retaliated against Plaintiffs based upon their race, national origin, and opposition to discrimination.

**158.** As a direct result of the retaliation by Defendants, Plaintiff Annam has suffered discriminatory terms and conditions of employment, including but not limited to a racially biased promotion of Austin Allcot and forcing Annam out of the CSE. Plaintiffs have also suffered baseless audits at the Primary Residence and warrantless violations and a vacate order at the Secondary Residence.

**159.** Defendants, under color of law, personally interfered with and deprived Plaintiffs of their constitutional rights, including but not limited to; enjoy freedom of speech, to

petition their government for redress of their grievances, to be secure in their person, to enjoy privacy, to be free from deprivation of life, liberty, and property without due process of law.

160.     Defendants acting individually and in their official capacities as public officials of defendant CITY, under color of law, and having been fully advised that Plaintiffs were being deprived of their constitutional rights, either acted in a concerted, malicious intentional pattern to further discriminate against Plaintiffs by engaging in retaliatory acts, or knowing such discrimination was taking place, knowingly omitted to act to protect Plaintiffs from continuing deprivations of their rights to enjoy freedom of speech, to petition their government for redress of their grievances, to be secure in their persons, to enjoy privacy, to be free from deprivation of life, liberty, and property without due process of law, all in violation of 42 U.S. C, § 1983.

161.     By reason of the foregoing, Plaintiffs are entitled to a money judgment for compensatory damages against all Defendants, with interest at the legal rate accrued and accruing thereon.

162.     Given the despicable, willful, wanton, and malicious nature of Defendants' conduct, Plaintiffs demand punitive and special damages on this claim.

**AS FOR AN EIGHTH CAUSE OF ACTION:**
**VIOLATION OF ARTICLE I, § 11 OF**
**THE NEW YORK CONSTITUTION**
(Against All Defendants)

163.     Plaintiff repeats and alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

164.     Article I, § 11 of the New York Constitution provides that, "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof."

165.     By reason of the foregoing paragraphs, by discriminating against Plaintiffs, Defendants deprived them of rights, remedies, privileges, and immunities guaranteed to every person, including, but not limited to the right guaranteed by Article I, § 11 of the New York Constitution to the equal protection of the laws.

166.     The Defendants acted under pretense and color of state law and within the scope of their employment as DOB employees.

167.     Defendant CITY, through DOB and acting under the pretense and color of law, permitted, tolerated, and was deliberately indifferent to a pattern, practice, or custom by DOB staff of discriminating against Plaintiffs for their race and national origin.

168.     As a direct and proximate result of Defendants' conduct, policies, practices, customs, and usages, Plaintiffs sustained the damages alleged, including but not limited to the deprivation of their rights to equal protection and equal dignity.

169.     By reason of the foregoing, Plaintiffs are entitled to a money judgment for compensatory damages against all Defendants, with interest at the legal rate accrued and accruing thereon.

170.     Given the despicable, willful, wanton, and malicious nature of Defendants' conduct, Plaintiffs demand punitive and special damages on this claim.

**AS FOR A NINTH CAUSE OF ACTION:**
**DISCRIMINATION IN VIOLATION OF**
**NEW YORK CITY ADMINISTRATIVE CODE § 8-107**
(Against All Defendants)

171.     Plaintiff repeats and alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

172.     The New York City Administrative Code § 8-107, makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment based upon race and national origin.

173.     Based upon the foregoing, Defendants discriminated against the Plaintiffs based upon their race and national origin, and in retaliation.

174.     As a direct and proximate result of the unlawful employment practices of Defendants, Plaintiffs have suffered the indignity of discrimination, retaliation and great humiliation.

175.     Due to Defendants' violations, Plaintiffs have been damaged economically, mentally and emotionally.

176.     By reason of the foregoing, Plaintiffs are entitled to a money judgment for compensatory damages against all Defendants, with interest at the legal rate accrued and accruing thereon.

177.     Given the despicable, willful, wanton, and malicious nature of Defendants' conduct, Plaintiffs demand punitive and special damages on this claim.

**AS FOR A TENTH CAUSE OF ACTION:**
**DISCRIMINATION IN VIOLATION OF**
**NEW YORK STATE EXECUTIVE LAW § 296**
(Against All Defendants)

178.     Plaintiff repeats and alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

179.     The New York State Executive Law § 296, makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment based upon race and national origin.

180.     Based on the foregoing, the Defendants intentionally and willfully discriminated against the Plaintiffs on account of his race, national origin, and opposition to discriminatory practices, in violation of New York State Executive Law §296.

181.     As a direct and proximate result of the unlawful employment practices of Defendants, plaintiffs have suffered the indignity of race discrimination, and great humiliation.

182.      Due to Defendants' violations, Plaintiffs have been damaged economically, mentally and emotionally.

183.     By reason of the foregoing, Plaintiffs are entitled to a money judgment for compensatory damages against all Defendants, with interest at the legal rate accrued and accruing thereon.

184.     Given the despicable, willful, wanton, and malicious nature of Defendants' conduct, Plaintiffs demand punitive and special damages on this claim.

**WHEREFORE**, Plaintiffs demand compensatory and punitive damages from these Defendants jointly and severally on all causes of action, in an amount to be determined at trial, plus any available statutory remedies, both legal and equitable, and interests and costs.

Dated: Brooklyn, NY
       July 8, 2022

/S/ Mustapha Ndanusa
Davis, Ndanusa, Ikhlas & Saleem LLP
By: Mustapha Ndausa, ESQ.
26 Court Street, Suite 603
Brooklyn, NY 11242
718-783-6819
855-852-4742
mdanusa@dnislaw.com